UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 05-67-P-H |
| | ) | |
| MARC SHINDERMAN, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION
AND ORDER ON MOTION TO UNSEAL AND DISCLOSE**

Marc Shinderman, M.D., is charged in a 68–count indictment with violating 21 U.S.C. § 843(a)(2) (25 counts of using a DEA registration number belonging to another); 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2 (25 counts of aiding the acquisition of a controlled substance by deception); 21 U.S.C. § 843(a)(4)(A) (two counts of falsifying pharmacy records); and 18 U.S.C. § 1035(a)(2) (16 counts of making false statements regarding health care matters). The indictment stems from an investigation performed by Senior Special Agent Eric Hafener of the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations. Dr. Shinderman has filed six inter-dependent motions in an effort to derail his prosecution, contending primarily: (1) that Hafener violated federal regulations designed to ensure the confidentiality of drug abuse patient records and that those records and their "fruit" should therefore be suppressed; (2) that Hafener assisted the Government's effort to secure a search warrant by making false representations to the Court in his search warrant affidavit; and (3) that the search warrant was overbroad with respect to the scope of data to be retrieved from computers and other digital media. The motions are as follows:

1.       Motion to Suppress on Title 42 Grounds (Docket No. 40);

2.      Motion to Suppress on Constitutional Grounds (Docket No. 34);

3.      Motion for Franks Hearing (Docket No. 37);

4.      Motion *in Limine* (Docket No. 36);

5.      Motion to Dismiss (Docket No. 38);

6.      Motion to Unseal Documents and for Disclosure (Docket No. 39).

For the reasons stated below, I recommend that the Court deny motions 1, 2, 3 and 5.  I also recommend that the Court deny the relief requested in motion 4, but issue an order requiring the Government to show cause in relation to how it intends to use evidence at trial that is subject to the confidentiality regulations pertaining to drug abuse treatment.  Finally, I grant motion 6.

## FACTS

The following facts are drawn from the April 2003 affidavit of Special Agent Hafener. CAP Quality Care (CAP) is a Maine corporation that provides methadone maintenance treatment at its facility in Westbrook, Maine.  (Hafener Apr. 2003 Aff. ¶ 4, Docket No. 40, Ex. A.)  CAP is a Medicaid provider and receives federal funds from Maine Medicaid to provide such treatments to Medicaid recipients.  Dr. Shinderman is the program's sponsor and its "national medical director."  Dr. Keefe is CAP's "medical director" in Westbrook, Maine.  (Id.)  In September of 2002, Hafener received information from a CAP patient that she had received Xanax[1] prescriptions from Dr. Shinderman that were drawn on prescription pads signed by Dr. Keefe. (Id. ¶ 5.)  In November 2002, Hafener learned from another CAP patient that he or she received methadone treatment and a Xanax prescription and that he or she observed Dr. Shinderman sign the prescriptions using Dr. Keefe's name and DEA registration number.  (Id. ¶ 6.)  Title 21 of the

---

[1]      According to Hafener's April 2003 affidavit, Xanax is the brand name for a drug containing alprazolam, a Schedule IV controlled substance.  (Hafener Apr. 2003 Aff. ¶ 7.)

United States Code, Section 843(a)(2) proscribes knowing or intentional use of a registration number issued to another person to dispense a controlled substance.

Special Agent Hafener sought and obtained Medicaid data from the Maine Department of Human Services (DHS), which included all Medicaid claims submitted by CAP to Maine Medicaid between October 4, 2001, and November 9, 2002.  (Id. ¶ 9.)  Included in the data were the names and addresses of CAP's methadone treatment patients or clients, which information is protected under regulations promulgated by the United States Department of Health and Human Services (DHHS).  See, generally, 42 C.F.R., Chapter 1, Part 2; see also 42 C.F.R. §§ 2.13, 2.53, 2.62, 2.66.  Hafener obtained access to this data pursuant to 42 C.F.R. § 2.53 for purposes of audit and evaluation activities conducted on behalf of DHHS.  The data obtained by Hafener from Maine DHS also included all prescriptions filled under Dr. Keefe's registration number that were paid for by Maine Medicaid between August 27, 2001, and December 24, 2002.  (Hafener Apr. 2003 Aff. ¶ 10.)  Additional data subpoenaed from CAP as part of Hafener's § 2.53 investigation provided the specific dates that Dr. Keefe worked at CAP.[2]  (Id. ¶ 11.)  Based on his review of the data collected to that point, Hafener concluded that, for the time period he was reviewing, at least 220 prescriptions were filled under Dr. Keefe's registration number on days that Dr. Keefe was absent from CAP's premises.  (Id. ¶¶ 12-13.)  Of the 220 prescriptions, 117 related to substances controlled by the United States Drug Enforcement Agency (DEA).  (Id. ¶ 13.)  According to Hafener's review of Dr. Shinderman's medical licensing information, Dr. Shinderman was not licensed to practice medicine in Maine after August 9, 2002, but 59 prescriptions were written after that date on Dr. Keefe's prescription pads, or over his signature, when Dr. Keefe was not present at CAP.  (Id. ¶¶ 14-15.)  From the various data and information

---

[2]     The subpoena is attached to the Motion to Suppress on Title 42 Grounds as Exhibit B and is dated November 26, 2002.  (Docket No. 40, Ex. b.)

Hafener received he inferred that Dr. Shinderman was the likely author of these prescriptions and that Dr. Shinderman violated, among other statutes, 21 U.S.C. § 843(a)(2) by using Dr. Keefe's registration number to dispense controlled substances.  (Id. ¶ 18.)  In the concluding paragraph of his April 2003 affidavit, Hafener asserted that "[t]he Medicaid billing data containing patient identifying information provided to [DHHS by DHS] cannot be obtained by other means.  (Id. ¶ 19.)

In April 2003, the United States Attorney for the District of Maine filed a sealed motion in this Court for an order permitting the disclosure of "certain records" obtained by DHHS during its investigation of CAP "to the United States and federal law enforcement personnel." (Ex Parte Motion for Disclosure at 1, Docket No. 40, Ex. G.)  The Government sought with the motion to obtain CAP's Medicaid records and the records obtained by DHHS pursuant to its November 2002 subpoena "for use in a criminal investigation of Dr. Marc Shinderman and Dr. Stephen Keefe."  (Id. at 2.)  The motion recited the statutory and regulatory framework that require court orders for the disclosure of confidential patient records relating to substance abuse treatment in programs receiving federal assistance.  (Id., citing, inter alia, 42 U.S.C. § 290dd-2(a) and 42 C.F.R. § 2.66.)[3]  On April 24, 2003, Magistrate Judge Cohen issued an order

---

[3]    Pursuant to 42 U.S.C. § 290dd-2:

§ 290dd-2.  Confidentiality of records

(a) Requirement. Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e), be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b).

(b) Permitted disclosure.
  (1) Consent. The content of any record referred to in subsection (a) may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g).

4

authorizing the disclosure of the stated documents to the United States and federal law enforcement personnel.  (Sealed Order of Apr. 24, 2003, Docket No. 39, Ex. A.)  In authorizing disclosure Magistrate Judge Cohen found that disclosure would be consistent with the governing regulations set forth at 42 C.F.R. §§ 2.64 & 2.66.  (Id.)  Among other conditions, disclosure was limited to the records relevant to the investigation of Dr. Shinderman and Dr. Keefe's prescription writing practices, prohibited the Government from using the documents to investigate or prosecute any patients of CAP, and required that Dr. Shinderman, Dr. Keefe and any patient whose records should be disclosed be notified of the disclosure within 90 days or as soon thereafter as possible, so that they might seek revocation or amendment of the order.  (Id. at 2-3.)

---

(2) Method for disclosure. Whether or not the patient, with respect to whom any given record referred to in subsection (a) is maintained, gives written consent, the content of such record may be disclosed as follows:
. . . .
(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm.  In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services.  Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

(c) Use of records in criminal proceedings. Except as authorized by a court order granted under subsection (b)(2)(C), no record referred to in subsection (a) may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.

(d) Application. The prohibitions of this section continue to apply to records concerning any individual who has been a patient, irrespective of whether or when such individual ceases to be a patient.
. . . .
(f) Penalties. Any person who violates any provision of this section or any regulation issued pursuant to this section shall be fined in accordance with title 18, United States Code.

(g) Regulations. Except as provided in subsection (h), the Secretary shall prescribe regulations to carry out the purposes of this section. Such regulations may contain such definitions, and may provide for such safeguards and procedures, including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C), as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.
. . . .

The following facts are drawn from Special Agent Hafener's August 2003 affidavit.  As of August 2003, Hafener was still conducting a "civil Medicaid investigation" of CAP.  (Hafener Aug. 2003 Aff. ¶ 4, Docket No. 40, Ex. I.)  According to his affidavit, Hafener was investigating allegations that CAP submitted claims to Medicaid for non-covered services, thereby violating the False Claims Act, among other federal laws.  (Id. ¶ 6.)  Hafener related in the August 2003 affidavit that he identified in excess of 2,000 claims for non-covered services that CAP submitted to Medicaid.  In addition, he related that he uncovered conduct by CAP and its employees that might violate federal criminal statutes and other drug laws and regulations, including billing for non-covered services and falsifying records.  (Id. ¶ 18.)  The balance of the affidavit concerned evidence Hafener gathered in relation to the investigation against CAP, but included numerous facts related to alleged or perceived conduct on the part of Dr. Shinderman.

On August 18, 2003, the USA filed a second *ex parte* motion for disclosure of documents obtained by Special Agent Hafener during his investigation of CAP, attaching Hafener's August 2003 affidavit as a supporting exhibit.  (Second *Ex Parte* Motion for Disclosure, Docket No. 40, Ex. H.)  The documents sought in the second motion were "patient-identifying confidential substance abuse information contained in CAP's substance abuse treatment records," which were disclosed to Hafener in response to the November 2002 subpoena, but not until May 2003 or later.  (Id. at 2.)  In addition, the motion sought "ongoing Medicaid paid claims data for CAP," because the prior order permitted disclosure of such data only for the period ending November 9, 2002.  (Id. at 2-3.)  In support of the motion, the Government cited Hafener's August 2003 affidavit, which asserted the following improper conduct, based on Hafener's ongoing investigation:

> (a) lack of individualized treatment plans and failure to review treatment plans every 90 days; (b) insufficient counseling and inadequate documentation of

> counseling; (c) split dose "take home," or unsupervised doses provided in
> violation of federal regulations; (d) billing Medicaid during weeks in which there
> was no direct encounter with the Medicaid client; (e) services rendered by Dr.
> Shinderman when he was not licensed in the State of Maine; and (f) various
> "questioned documents" that appear to be altered, backdated, or otherwise false.

(Hafener Aug. 2003 Aff. ¶ 18.)  On August 22, 2003, Magistrate Judge Cohen granted the

motion, imposing the same restrictions and conditions recited in his May order.  (Docket No. 40,

Ex. D.)  Thus, among other conditions, the order required that notice be provided to the doctors

and their patients within 90 days of disclosure or as soon thereafter as possible, to enable them to

seek revocation or amendment of the Court's order.  (Id. at 3.)

On September 5, 2003, the Government submitted to the Court an application and

affidavit for a search warrant (SW Application, Docket No. 37, Ex. A) and a companion *ex parte*

motion for permission to seize certain of CAP's confidential medical records (Third *Ex Parte*

Mot., Docket No. 37, Ex. B).  The affidavit supporting the search warrant application was

prepared by Special Agent Hafener.  (Hafener Sept. 2003 SW Aff., Docket No. 37, Ex. A.)  The

*ex parte* motion related that it was filed "in order to comply with the federal privacy rules and

regulations that govern CAP's medical, psychiatric and/or substance abuse records, which are the

subject of the search warrant application."  (Third *Ex Parte* Mot. at 1.)  The search warrant

affidavit described the information obtained "during the course of a joint investigation being

conducted" by the Department, the DEA and the United States Attorney's Office for the District

of Maine.  (Hafener Sept. 2003 SW Aff. ¶ 4.)  Hafener asserted the following background

concerning the investigation:

> Since about August 2002, I have been involved in an investigation of methadone
> clinics in Southern Maine prompted by the large number of overdose and
> overdose death cases attributable to the diversion of methadone from such clinics.
> Methadone is a Schedule II controlled substance.  Of 374 drug related deaths in
> Maine from 1997 to 2002, methadone is mentioned as a cause of death (alone or
> in combination with other drugs) in 33% of all deaths caused by narcotics.  In

> 2002, a large spike in life-threatening opiate-abuse encounters was observed by
> the Maine Emergency Medical Services, increasing to a rate of about one patient
> every day, and was believed to have been caused by, among other factors, the
> availability of methadone as a drug of abuse, large quantities of illicitly available
> methadone, and the utilization of methadone as a recreational drug of abuse;
> "high-dose" methadone and methadone diversion to non-clinic patients appeared
> to be common threads in many (but not all) of the emergency patient encounters.

(Id. ¶ 6 (citation to senate hearing testimony omitted).)  He thereafter asserted that he opened an

investigation of CAP in November 2002 to determine if CAP complied with Medicaid

regulations and other federal regulations pertaining to take-home methadone and that he had, in

the course of his investigation, found numerous violations of Medicaid regulations and criminal

violations as well.  (Id. ¶ 8.)  The balance of the affidavit recounts Hafener's investigatory

findings and his grounds for believing that a search of CAP's premises would yield evidence of

the crimes of health care fraud (18 U.S.C. § 1347), false statements (18 U.S.C. § 1001), false

statements related to health care matters (18 U.S.C. § 1035(a)), obstruction of department

proceedings (18 U.S.C. § 1505), destruction, alteration, and falsification of records in federal

investigations (18 U.S.C. § 1519), presenting a claim for a physician's service knowing that the

individual was not a licensed physician (42 U.S.C. § 1320a-7b(a)(5)), false statements used in

determining rights to payments under a federal health care program (42 U.S.C. § 1320a-

7b(a)(2)), unlawful distribution of controlled substances, including, but not limited to,

methadone (21 U.S.C. § 841(a)(1)), using, in the course of distributing or dispensing a controlled

substance, a registration number belonging to another person (21 U.S.C. § 843(a)(2)), furnishing

false and fraudulent material information in records required by the D.E.A. (21 U.S.C. §

843(a)(4)(A)), and using a communication facility to violate the federal drug laws (21 U.S.C. §

843(b)).  (Id., conclusion par.)  Magistrate Judge Brownell executed the search warrant

application on September 5, 2003, (Search Warrant, Docket No. 37, Ex. A), and

contemporaneously issued an order authorizing the United States to seize confidential medical records based on his conclusion that the circumstances were sufficient to satisfy the regulatory standards set out in the Code of Federal Regulations, Title 42 Sections 2.64(d) and 2.66(a). (Sept. 5, 2003 Order, Docket No. 40, Ex. E.)  As with the prior orders authorizing disclosure, the Court afforded the Government 90 days to notify Dr. Shinderman, Dr. Keefe and the relevant patients.  (Id. ¶ 7.)  Among other evidence relevant to the investigation, the search warrant authorized the United States to seize "[a]ny and all electronic data processing and storage devices, computer, and computer systems and the information and/or data contained therein . . . ."  (Search Warrant, Schedule A, § o; see also id. §§ o(i)-(viii) (including every type of electronic or computerized data system, storage system, component, hardware, software, related documents and any and all electronic information, data or files contained thereon).)

*The Evidence Offered by the Defendant*

In addition to the various affidavits and motions, the subpoena and court orders, Dr. Shinderman supports his motion with a copy of a November 26, 2002, cover letter sent to CAP in conjunction with the Department's subpoena request and with an affidavit submitted by CAP's civil counsel.  The cover letter reflects that Joseph C. Moraski, Special Agent in Charge, informed CAP that the Department's investigators would comply with regulations and "security procedures" pertaining to the preservation of confidential patient information.  (Docket No. 40, Ex. B.)  Although the letter informed CAP that subpoena authority was asserted under 5 U.S.C. App. 3 § 6(a)(4), it did not, contrary to Dr. Shinderman's characterization, contain language to the effect that the Department's "use of the confidential patient records would be strictly limited to the audit and evaluation purposes (including a Medicaid or Medicare civil investigation) and

9

for no other reason."  (Mot. to Suppress on Stat. and Reg. Grounds ("Title 42 Mot.") at 7, Docket

No. 40.)

As for the affidavit, James M. Bowie, Esq., served as counsel to CAP "in connection with

certain civil litigation and administrative matters," including CAP's compliance with the

Department's November 2002 subpoena.  (Bowie Aff. ¶ 4, Docket No. 40, Ex. F.)  Attorney

Bowie asserts that he communicated with Special Agent Hafener between December 2002 and

September 2003 and that he was "assured by Agent Hafener that the [DHHS] Office of Inspector

General was authorized to access . . . records by virtue of its subpoena since it was issued in

connection with the OIG's authority to conduct civil audit and program reviews of CAP."  (Id. ¶

6.)  Attorney Bowie further asserts that his firm "coordinated a rolling production of CAP's

records . . . between January and August of 2003."  (Id. ¶ 9.)  During that time, according to

Attorney Bowie, he spoke with Hafener on at least two occasions and was informed "that no

criminal investigation of [CAP] or its staff was then underway and that the government had no

present intention of initiating one."  (Id. ¶ 11.)  Attorney Bowie qualifies this statement as

follows:  "Agent Hafener did not say that a criminal investigation of [CAP] would never be

undertaken.  However, he did say that he thought the matter would be resolved through a civil

settlement."  (Id.)  According to Attorney Bowie, in late May 2003, Hafener asked to interview

CAP employees and to review additional patient records on-site in order to "clarify" certain

information obtained from the subpoena and to ensure CAP's compliance with Medicaid

regulations.  (Id. ¶ 13.)  Attorney Bowie asserts that he and his client, after consultation, agreed

to permit Hafener to conduct an on-site review of records and to interview CAP staff because of

Hafener's "explicit representation that there was no ongoing criminal investigation of CAP and

its staff."  (Id. ¶ 14.)  He further asserts that he would have declined this request and would have

immediately secured criminal defense counsel for CAP had he been aware that the United States was conducting a criminal investigation at the time (May and June of 2003), or had he received notice that the Court had authorized the Department, based on the United States' *ex parte* motion, to disclose CAP's substance abuse treatment records to the United States Attorney's Office.  (Id. ¶ 15.)

*Additional Evidence Submitted by the United States*

Attached to the United States' consolidated response to the pending motions are three notification letters that, according to the United States, were sent to Dr. Shinderman and his counsel, Thimi Mina, Esq., of McCloskey, Mina & Cunniff, LLC.  The first is a September 12, 2003, letter addressed to Dr. Marc Shinderman attaching a form notice used to notify CAP's patients of the disclosure of their records and also the underlying court order authorizing disclosure to the United States.  (Docket No. 45, Ex. 1.)  The second and third letters were dated November 17, 2003, and November 21, 2003, were both addressed to Attorney Mina and enclosed similar form notices and the underlying court orders.  (Id., Exs. 2 & 3.)  The United States has also submitted a responsive affidavit from Special Agent Hafener that summarizes his investigation and his interaction with Attorney Bowie in relation to the subpoena.  He relates, among other things, that the records he received as of the January 3 return date on the subpoena "did not contain any patient identifying information as defined by 42 C.F.R. § 2.11."  (Hafener Response Aff. ¶ 4, Docket No. 45, Elec. Attach. 1.)  He relates further:

> 6.      In February 2003, I conducted an analysis of business records provided by CAP (that did not contain any patient identifying information) and Medicaid data. This analysis was done to determine if evidence supported the allegation that the defendant was forging prescriptions in CW-1's name and using CW-1's DEA registration number.  The records supported the conclusion that the defendant was forging prescriptions in CW-1's name and using CW-1's DEA registration number.

7.     On March 11, 2003, I completed a Situation Report (an internal HHS-OIG document that initiates an investigation) listing the defendant as the subject (the "Criminal Investigation").  The Situation Report was assigned a criminal case number (an internal case number reflecting that the case may have the potential to be prosecuted criminally) and thereafter the matter was assigned to Special Agent Fleming.  United States Attorney's Office ("USAO") Investigator Owen Colomb, and diversion Investigator Joanne Masar, of the Office of Diversion Control for the United States Drug Enforcement Administration ("DEA") were also assigned to the Criminal Investigation of the defendant (the "criminal investigators"), by their respective agencies.

8.     On April 22, 2003, the USAO submitted a motion requesting permission to disclose substance abuse treatment records for use in the Criminal Investigation of the defendant (the "First Disclosure Motion").  This motion was granted on April 24, 2003 (the "April 24, 2003 Order").

9.     Within days of the issuance of the April 24, 2003 Order, and still in April 2003, I made the first disclosure of patient identifying information (from Medicaid claims data) to the criminal investigators.  This disclosure did not include any patient identifying information obtained from CAP, because as of that date I had not received any such information.  The Medicaid claims data was the only disclosure of patient identifying information that I made to the criminal investigators until after August 26, 2003.

10.    Between January 3, 2003 and May 7, 2003, I made several attempts to determine when I would receive patient files from CAP in response to the administrative Subpoena.  On May 7, 2003, I sent an e-mail to Attorney Bowie explaining the consequences if CAP did not produce records by May 21, 2003.  I received a letter from Attorney Bowie postmarked May 13, 2003, in which Attorney Bowie stated "if you need to engage in some sort of sampling in the office, we can accommodate that as well."

11.    On May 20, 2003, I obtained two more boxes of patient records from CAP pursuant to the administrative Subpoena.  These were the first records containing patient identifying information that I received from CAP.

12.    On June 11, 2003, I spoke with Attorney Bowie and recorded the substance of this conversation contemporaneously in an e-mail to the USAO.  Based on that conversation, I believed that Attorney Bowie only represented CAP.  I told Attorney Bowie that my investigation of CAP was still a civil investigation because it still was a civil investigation.  As of that date, I had only reviewed about 63 patient records obtained from CAP.

13.    On June 19 and 20, 2003, I led a team of HHS-OIG Special Agents and Investigative Assistants in conducting an on-site record review at CAP, pursuant

to the administrative Subpoena and at the invitation of Attorney Bowie.  The criminal investigators did not participate.

14.     On June 26, 2003, I received an additional box of records from CAP pursuant to the administrative Subpoena.

15.     During the months of June, July and August, 2003, I continued to review the records obtained from CAP in connection with my civil Investigation.  Based on this review and information obtained from interviews of clients and former CAP employees, I determined that there were wide-scale problems with CAP's compliance with Medicaid and other regulations.  I also learned that the criminal investigators had developed additional evidence that the defendant had used CW-1's DEA number on prescriptions, and that the DEA had uncovered wide-scale problems with CAP's record keeping from controlled substances.

16.     Between February and August 2003, I conducted about 19 interviews in connection with the civil investigation and attempted four other interviews.  I spent two days conducting an on-site records review at CAP.  These interviews, attempted interviews, and the onsite review did not involve any criminal investigators.  Instead, I relied on assistance from agents assigned to the Concord, New Hampshire and Boston, Massachusetts HHS-OIG offices.  Both offices are located about two hours from the Portland Office.

17.     In the reports that I prepared between November 2002 and August 2003, I used confidential information numbers in the place of patient names to further protect the patient identifying information I obtained in this case.  I was the only person during that time period that knew the patient information that corresponded to the confidential information numbers.  Prior to August 26, 2003, the patient identifying information that I obtained from CAP was not disclosed to the criminal investigators.

18.     On August 18, 2003, the USAO submitted a second motion requesting permission to disclose substance abuse treatment information obtained during the civil Medicaid investigation to federal criminal prosecutors and the criminal investigators (the "Second Disclosure Motion").  An Order granting permission to do so was signed on August 22, 2003.  On August 26, 2003, I learned from the USAO that the motion had been granted and that I could disclose patient identifying information to USAO Investigator Colomb, which I thereafter did disclose.

19.     On August 27, 2003, I filled out a Situation Report listing CAP as a subject of a criminal investigation by HHS-OIG.

**DISCUSSION**

Dr. Shinderman's motions are designed to build upon one another.  I address the motions in their logical order.

**A.      Motion to Suppress on Title 42 Grounds**

I first consider Dr. Shinderman's "Motion to Suppress Evidence Obtained in Violation of Statute and Regulations Governing Disclosure of Confidential Substance Abuse Patient Information" ("Title 42 Mot.," Docket No. 40).  In the memorandum of law incorporated into this motion, Dr. Shinderman observes that the United States intends to call several CAP patients to testify as part of its case against Dr. Shinderman.  (Id. at 1-2 & n.2.)  Positing that some of these patients were contacted as a result of the disclosure of CAP's confidential treatment records, Dr. Shinderman seeks to suppress any such testimony and the use of any such records on the ground that Special Agent Hafener, although concededly a civil investigator having authority to conduct an audit of CAP for Medicaid compliance, was also wearing his "criminal investigator" hat at the very outset of his investigation, because Hafener asserted in his April 2002 affidavit that the information that spurred his investigation (that Dr. Shinderman issued a prescription using Dr. Keefe's DEA registration number, name and signature) constituted a crime under 18 U.S.C. § 843(a)(2).  Thus, according to Dr. Shinderman, Hafener was required to obtain a court order before using an administrative subpoena to obtain documents from CAP, because he intended to review CAP's records to determine, among other things, whether criminal activity had occurred.  (Title 42 Mot. at 6-7.)  In support of this theory, Dr. Shinderman argues:

> The fact that at all times material to this case Agent Hafener was acting as *both* the government's lead criminal and civil investigator only accentuates the importance of strict compliance with the governing statute and regulations.  While it is arguably a *per se* violation of 42 C.F.R. §290dd-2 and the underlying regulations for a single agent to wear both hats, where the agent is operating exclusively within a regulatory framework requiring *unconditional compliance* as

14

a prerequisite to his having access to highly protected information, and where that information forms the crux of both the criminal and civil investigations, it is fanciful to suggest that an agent is capable of segregating his own knowledge of the protected information for use only in his civil investigation and not in his simultaneous criminal investigation.

Here, it can be fairly inferred that the government's administrative subpoena was used as a strategic substitute for a search warrant in order to simultaneously advance its criminal and civil investigations and to avoid notifying the clinic or the doctors that a criminal investigation was afoot. By law, once the government undertook to investigate CAP or Drs. Shinderman and Keefe for prescription writing practices, it had a duty to apply for a court order authorizing its use of confidential patient records or communications in furtherance of that investigation. 42 C.F.R. §§2.53(d), 2.66. That should have been done in this case by no later than November 26, 2002, when Agent Hafener was well on the trail of the perceived criminal violation and the government formally sought to compel the confidential records from CAP by means of an administrative subpoena.

(Id. at 8-9.)  In addition to this argument, Dr. Shinderman contends that the regulations protecting patient confidentiality were also violated because the Court gave the Government 90 days to notify him, when the regulations provide that notice must be given upon "implementation" of a court's disclosure order, so that the patient or target of the investigation can have a meaningful opportunity to seek revocation or amendment of the court's order. (Id. at 9.) In addition to objecting to the propriety of the 90-day notice requirement—as opposed to an immediate notice requirement—Dr. Shinderman asserts "[u]pon information and belief, and after diligent inquiry," that "no notice was ever provided to CAP, [the doctors] or their counsel." (Id. at 11.) Dr. Shinderman therefore posits that evidence should be suppressed based on the United States' failure to comply with the Court's orders. (Id. at 17-19.) Third, Dr. Shinderman complains that CAP's counsel was misled by Hafener to believe that no criminal investigation was taking place at a time when the United States was contemporaneously preparing or filing its April 2003 *ex parte* motion to obtain the documents Hafener was receiving pursuant to CAP's continuing production of documents in response to the November 2002 subpoena. (Id. at 13-15.) Dr. Shinderman argues that this alleged misrepresentation is evidence of coercion and vitiated

the voluntariness of any consent that enabled Hafener to access the relevant records or CAP's premises and employees.  (Id. at 15.)  In Dr. Shinderman's words:

> The Court should not permit the government to deprive CAP and Dr. Shinderman of timely notification of its use of confidential treatment records, allow it to invoke a [90-day] notification schedule that is not authorized by the regulations, and then tolerate a compounding of these error by [the government's] subsequent misrepresentations to their attorney about the government's ongoing criminal investigation.

(Id. at 16.)

In response, the United States argues that, even if a violation of the regulations is made out on this record, an exclusionary remedy for Dr. Shinderman is not called for (1) because the disclosure of confidential patient records did not violate anyone's constitutional right, let alone Dr. Shinderman's; (2) because neither the statute at issue, 42 U.S.C. § 290dd-2, nor the governing regulations call for suppression of evidence; and (3) because the statute and regulations are designed to protect patients, not doctors.  (Gov't Responsive Mem. at 12-16.)  As for the violation issue, the United States observes that the Department has subpoena power to obtain the records in dispute for its legitimate audit and evaluation purposes anyway, so the only issue is whether it protected any confidential patient records from further disclosure in accordance with the regulations.  (Id. at 15.)  It also asserts that a criminal investigation of Dr. Shinderman did not commence until March 11, 2003, when the Department opened a criminal case against him and assigned Special Agent Fleming as the case agent.  (Id. at 16.)  As for whether the notice requirement of the regulations was violated, the United States argues that the Court has authority to delay notification and that the phrase "upon implementation," which triggers the obligation to notify, is not synonymous with "upon disclosure to criminal investigators," but upon disclosure in a public proceeding.  (Id. at 17-18 & n.3.)  In any event, argues the United States, Dr. Shinderman was not himself entitled to notification and therefore

16

has no right to challenge the orders.  Additionally, says the United States, the 90-day requirement was authorized by the Court, was fully complied with, and was not an abuse of authority that should be discouraged by means of an exclusionary remedy.  (Id. at 18-19.)  As for the alleged misrepresentation concerning the existence of a criminal investigation, the United States argues that Hafener's statements were not false and, in any event, that the records at issue were obtained by subpoena, making the issue of CAP's consent a red herring.  (Id. at 20-21.)

       *1.*       ***Congress has not prescribed an exclusionary remedy.***

The congressional decree that "records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research . . . be confidential and be disclosed only for the purposes and under the circumstances expressly authorized," 42 U.S.C. § 290dd-2(a),[4] does not call for an exclusionary remedy. Instead, the statute's penalty provision provides, exclusively, for fines.  Id. § 290dd-2(f).  To the extent that a blanket prohibition might be drawn from the statute against the use or introduction of a confidential record to advance a criminal investigation or prosecution, such a prohibition would exist, exclusively, for investigations or prosecutions targeting a patient.  Id. § 290dd-2(c). Even when a patient's rights are at stake, exceptions may be authorized by a court.  Id. ("Except as authorized by a court order . . . no record . . . may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.").  It bears noting at the outset that, although Dr. Shinderman complains of various technical violations pertaining to notice and the timing of a criminal investigation by the Department, his motions and supporting memoranda do not suggest that good cause for disclosure was absent or that, had he been provided with notice earlier, there would have been good grounds for him to raise a

---

[4]      See footnote 3 for the language of the statute.

challenge to the United States' good cause presentation.  Nor is there any suggestion that he is now prejudiced in that endeavor by virtue of the 90-day notice provision.  Nor is there any suggestion that the Court failed to "impose appropriate safeguards against unauthorized disclosure."  Id. § 290dd-2(b)(2)(C).  Accordingly, I agree with the United States that, even if some irregularity were present in the record, Congress has not prescribed an exclusionary remedy for the benefit of programs or their employees who become targets in criminal investigations or defendants in criminal prosecutions.

> **2.     Dr. Shinderman fails to show that any prejudice arose as a result of the Court's 90-day notice provisions.**

Title 42 U.S.C. § 290dd-2(g) authorizes the Secretary of DHHS to "prescribe regulations to carry out the purposes of this section . . . , including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C), as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."  Pursuant to section 2.13 of Title 42 of the Code of Federal Regulations:

> (a) General. The patient records to which these regulations apply may be disclosed or used only as permitted by these regulations and may not otherwise be disclosed or used in any civil, criminal, administrative, or legislative proceedings conducted by any Federal, State, or local authority.

42 C.F.R. § 2.13(a).  From there, the regulations focus not on the need to protect "patient records" *per se*, but to protect patient records containing certain kinds of entries, including "patient identifying information," id. § 2.53(a), (b), and "confidential client communications," id. § 2.63.  As concerns the instant dispute, the regulations permit one engaged in "audit and evaluation activities" on behalf of a federal agency to conduct on premises review of confidential records containing patient identifying information provided that he or she agrees in writing not to

make any further disclosure of such information without authorization from a court order.  42 C.F.R. § 2.53(a).  In addition, records may be copied and removed by one engaged in audit and evaluation activities who agrees in writing to maintain the records in accordance with certain security requirements, to destroy all patient identifying information upon completion of the audit or evaluation, to prevent further disclosure and to use the records only as authorized under the regulations.  Id. § 2.53(b).   Access to patient identifying information for "audit and evaluation" use does not require a court order and includes "a civil or administrative investigation of the program by any Federal, State, or local agency responsible for oversight of the Medicare or Medicaid program and [ ] administrative enforcement, against the program by the agency, of any remedy authorized by law to be imposed as a result of the findings of the investigation."  Id. § 2.53(c).  Any further use to investigate or prosecute criminal or other activities is to be pre-authorized by a court order entered under § 2.66 of the regulations.  Id. § 2.53(c)(4), (d).  However, a court may not authorize the use or disclosure of patient identifying information for purposes of investigating or prosecuting a *patient*, except under very narrow circumstances involving, *inter alia*, "extremely serious" crimes.  Id. §§ 2.62, 2.65.  Disclosure and use of records to investigate or prosecute a program or the person holding the records (or employees or agents of that program or person) is condoned when the patient records "are needed to provide material evidence."  Id. § 2.66(a).  A disclosure application may be "granted without notice."  Id. § 2.66(b).  Notice is required only "upon implementation of an order," so that the program, persons holding the records or patients are "afforded an opportunity to seek revocation or amendment of that order, limited to the presentation of evidence on the statutory and regulatory criteria for the issuance of the court order."  Id.

As noted previously, none of Dr. Shinderman's various motions suggests that the motions for disclosure submitted by the United States fell short of the statutory and regulatory criteria for issuance of the orders.  Under these circumstances, and particularly in view of the fact that disclosure of the patient identifying information to the United States did not infringe upon any right to confidentiality held by Dr. Shinderman, I fail to see how the 90-day notification period inserted by the Court into each of its orders in any way prejudiced Dr. Shinderman's ability to request an amendment or revocation of those orders at this time.  Of course, once the patient identifying information was disclosed to the United States upon "implementation" of the Court's orders, any confidentiality was compromised.  Thus, even immediate notification of the disclosures to CAP or Dr. Shinderman would not have prevented the disclosures from occurring. The interest at stake, then, is not the interest in preventing any disclosure, because the disclosure was already authorized by the Court.  Instead, the issue is whether Dr. Shinderman can establish that the United States' access to the patient identifying information should now be restricted or revoked based on the regulatory criteria.  Dr. Shinderman fails to explain how notification 90 days "late" prejudiced his ability to address that question.  In other words, Dr. Shinderman fails to demonstrate that any personal confidentiality interest is at stake or that he has suffered any prejudice as a consequence of delayed notification.

> **3.** ***Audit access to patient identifying information versus disclosure to and use of such information to advance a criminal investigation or prosecution.***

According to Dr. Shinderman, even though Special Agent Hafener had authority under the regulations to review confidential patient records, including those containing patient identifying information, while he was engaged in audit and evaluation activities for DHHS, Hafener nevertheless should have obtained a court order before subpoenaing any documents

because he may have been "wearing two hats" for DHHS in the course of his investigation. (Title 42 Mot. at 8.)  The evidence demonstrates that Hafener was assigned to conduct an administrative audit of CAP.  It is uncontested that such an audit was within DHHS's administrative jurisdiction.  Because Hafener was permitted by regulation to review records containing patient identifying information in his capacity as a Medicaid auditor, 42 C.F.R. § 2.53, I conclude that a court order was not required for him to look at or "disclose" to himself the patient identifying information that came into his possession.   As for the restriction against the "use" of such information to investigate criminal activity, 42 C.F.R. § 2.53, Hafener avers that he was engaged in a civil investigation and therefore not wearing two hats.  Thus, although his affidavit indicates that he knew a criminal investigation was occurring and that he communicated with the criminal investigators and with the United States Attorney's Office at a time when he had access to patient identifying information, (Hafener Responsive Aff. ¶¶ 13, 15-16), it also indicates that Hafener prevented the disclosure of any patient identifying information to criminal investigators by using confidential code numbers in his reports when referring to patients.  (Id. ¶ 17.)  According to Hafener, it was not until August 26, 2003, that he disclosed patient identifying information to criminal investigators, after being informed that the Court had granted the United States' motion for disclosure.  (Id. ¶ 18.)  Based on these facts, I conclude that neither Hafener nor DHHS impermissibly used patient identifying information to advance any criminal investigation.  Because patient identifying information was not used to advance a criminal investigation, I further conclude that court authorization was not needed at the commencement of Hafener's civil investigation in order for him to analyze records that contained such information.

### 4.     *Misrepresentation regarding the existence of a criminal investigation*

It has been held in the context of Internal Revenue Service investigations that "a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of [an] Internal Revenue agent."  United States v. Tweel, 550 F.2d 297, 299 (5th Cir.1977).  It has also been stated that "[g]enerally an affirmative misrepresentation by an IRS agent that the investigation is routine when in fact it is a criminal investigation requires suppression of evidence."  United States v. Nuth, 605 F.2d 229, 234 (6th Cir.1979) (involving a claim that misrepresentation of the purpose behind an IRS audit caused the defendant to provide an interview and turn over personal documents, acts that implicated the defendant's Fifth Amendment right not to be a witness against himself).  However, the mere failure to warn that a civil investigation might result in criminal charges does not constitute fraud, trickery or misrepresentation.  United States v. Prudden, 424 F.2d 1021, 1033 (5th Cir. 1970,  cert. denied, 400 U.S. 831 (1970).  See also, cf., United States v. Squeri, 398 F.2d 785, 788 (2d Cir. 1968) ("The information that a taxpayer's returns are under audit gives notice of the possibility of criminal prosecution regardless of whether the agents contemplate civil or criminal action when they speak to him.").

As for the alleged misrepresentation in this case, it concerns only the issue of whether a member of CAP's staff was under criminal investigation.  According to Attorney Bowie, Special Agent Hafener assured him "that no criminal investigation of [CAP's] staff was then underway and that the government had no present intention of initiating one."  (Bowie Aff. ¶ 11.)  In fact, the United States has not initiated a criminal proceeding against CAP.  Special Agent Hafener avers that he only told Attorney Bowie that his investigation of CAP was civil in nature, without giving any assurances about "staff."  (Hafener Resp. Aff. ¶ 12.)  The factual dispute concerns

whether or not Hafener misled Bowie concerning the existence of criminal investigations targeting CAP's staff (including, by implication, Dr. Shinderman).  I conclude that it is not necessary to resolve this factual dispute before ruling on this motion because, even if Hafener purposefully misled Bowie in an effort to hide the criminal investigation of Dr. Shinderman, CAP fails to make any showing that, as a result of such deception, it waived a constitutional right to withhold the contested records.

Dr. Shinderman argues that "[a] government agent's misrepresentation of the nature of an investigation can be 'strong evidence of coercion,'" quoting United States v. Mapp, 561 F.2d 685, 689 (7th Cir. 1977), and that "such misrepresentations . . . vitiate the voluntariness of any consent to [] government inspection of a target's books and records," citing United States v. Hrdlicka, 520 F. Supp. 403, 409-10 (W.D. Wis. 1981).  But for the alleged misrepresentation, argues Dr. Shinderman, Attorney Bowie would not have permitted uncounseled employee interviews or on-site review of corporate records.  (Title 42 Mot. at 16.)  The quoted passage from the Mapp opinion concerned the Fifth Amendment prohibition against coerced testimony. There is no evidence of any custodial interrogations taking place in this case that would give rise to a Fifth Amendment concern or a right to a Miranda warning.  Furthermore, CAP does not have a Fifth Amendment privilege to withhold its corporate records.[5]  See Wilson v. United States, 221 U.S. 361, 376 (1911) (holding that corporations have no Fifth Amendment privilege with respect to their books and papers); compare United States v. Doe, 465 U.S. 605, 613 (1984) (affirming finding that the act of producing documents would involve testimonial self-incrimination on the part of a sole proprietor); Fisher v. United States, 425 U.S. 291, 410-414 (1976) (discussing the inherent communicative aspects of having an individual taxpayer produce in response to subpoena documents in his accountant's possession, but concluding on the facts

---

[5]     Magistrate Judge Cohen made this same observation in Amato.  2005 U.S. Dist. LEXIS 11867, *17-*21.

23

that the mere act of producing documents not among his personal papers did not involve testimonial self-incrimination); cf. United States v. Harte-Hanks Newspapers, 254 F.2d 366, 369 (5th Cir. 1958) (reversing an order barring the prosecution from using disclosed documents at a grand jury proceeding where defendants' counsel attempted to condition disclosure on non-use for purposes of any criminal investigation).  The Hrdlicka decision cited by Dr. Shinderman concerned the voluntariness of a consent to search the defendant's business premises, a Fourth Amendment concern, but the IRS agent investigating that case was not enforcing a subpoena. According to the Government, the existence of a valid subpoena neutralizes Dr. Shinderman's search-by-fraud argument.  (Docket No. 45 at 21 ("Here, all of CAP's records were obtained by subpoena or search warrant . . . .  Thus, assuming that a misunderstanding occurred, there is no basis to suppress any evidence for lack of voluntariness.").)  The United States does not cite authority for this proposition and does not fully articulate the reasoning behind it.  I conceptualize the argument as follows:

1.      Dr. Shinderman has not raised any constitutional ground that would have justified CAP's non-compliance with the Department's subpoena.

2.      Dr. Shinderman's only statutory argument for non-compliance with the subpoena (that the government violated the Title 42 regulations) is not a legitimate basis to quash the subpoena.

3.      Neither CAP nor Dr. Shinderman ever moved to quash the subpoena, in any event.

4.      The relinquishment of the right to move to quash the subpoena, even if induced by deceit or misrepresentation, did not implicate a constitutional right.

5.      Therefore, an exclusionary remedy would be inappropriate in this case.

Most of the case law that touches on this dispute has been created in the context of motions to quash. See, e.g., Crystal v. United States, 172 F.3d 1141, 1148-49 (9th Cir. 1999) (declining to quash a subpoena that issued after an IRS agent misrepresented that no criminal investigation existed because "there is no triable issue as to whether the IRS intentionally or knowingly misled the Crystals, *or issued the subpoena as the result of any information provided* [in reliance on a misleading assertion]").  I have been unable to locate a case directly on point that would afford clear guidance.  However, I conclude that in the absence of an underlying constitutional right in Dr. Shinderman to prevent CAP from complying with the Department's administrative subpoena, an exclusionary remedy would not be called for.  See, e.g., United States v. Orlando, 281 F.3d 586, 596 (6th Cir. 2002) ("Where Congress has provided a particular remedy for the violation of a statute, that remedy, and not judicially imposed remedies, should apply in the absence of a constitutional violation."); United States v. Ramsey, 165 F.3d 980, 991 (D.C. Cir. 1999) (same) (collecting cases).[6]

Secondly, Dr. Shinderman fails to demonstrate that non-compliance with the subpoena would have been possible on any non-constitutional grounds.  But unless the subpoena was invalid, or unless Dr. Shinderman can explain how it is CAP might otherwise have avoided the production of documents responsive to the subpoena, it cannot truly be said that fraud or deceit were the but for cause of production.[7]  It is also doubtful that Dr. Shinderman would have had standing to object to a subpoena directed to CAP for the production of its corporate records.  Dr. Shinderman has not suggested that any of the records reviewed pursuant to the subpoena were Dr. Shinderman's personal papers.  Nor has he suggested that the subpoena itself was served in

---

[6]      Even if a constitutional violation could be found on these facts, a valid subpoena would likely avert an exclusionary remedy.  See United States v. Eng, 971 F.2d 854, 859-60 (2d Cir. 1992).

[7]      The Government has not raised the inevitable discovery rule, presumably because Dr. Shinderman has not raised any constitutional challenge.  See, e.g., United States v. Eng, 971 F.2d 854, 860 (2d Cir. 1992) (discussing the role that subpoenas play in the inevitable discovery context).

order to cover up for prior improprieties in the investigation into his activities.  The misrepresentation he alleges occurred after the subpoena was issued and after CAP had already made various disclosures in response to it.

Finally, Attorney Bowie's affidavit testimony is critical to this issue.  He asserts that "Agent Hafener did not say that a criminal investigation of [CAP] would never be undertaken." (Bowie Aff. ¶ 11.)  In other words, CAP was not goaded into compliance with the subpoena with false assurances regarding future consequences.  Particularly in this light, it is difficult to understand what CAP gave up other than its right to file a motion to quash.  Moreover, based on Bowie's and CAP's understanding that the ongoing audit could result in more than just civil penalties for CAP, I fail to understand how the facts of this case reflect that CAP, let alone Dr. Shinderman, could have materially relied on Special Agent Hafener's alleged representation to its detriment.  To the contrary, it is evident from Attorney Bowie's affidavit testimony that CAP consented to produce the documents and to permit employee interviews to occur having full knowledge that it was under investigation for alleged violations of Medicaid or Medicare laws and regulations that could result in both civil penalties and criminal proceedings.  Based on the foregoing factors, I recommend that the Court deny the "Title 42 Motion" without a hearing.

**B.      Motion to Suppress on Constitutional Grounds (Docket No. 34)**

Dr. Shinderman argues that probable cause for the search warrant was lacking because it was improper for the Court to consider in the probable cause analysis evidence obtained by the Government in violation of the Title 42 patient confidentiality regulations.  (Mot. to Suppress at 3, Docket No. 34.)  In addition, Dr. Shinderman argues that the search warrant was overbroad with respect to the scope of computer-related materials and electronic data that could be seized.

(Id. at 3-6.)  The Government responds that Dr. Shinderman lacks standing to object to the search warrant.  (Gov't Response at 26-28.)

### 1.     Standing

The records, papers and effects seized from CAP's Westbrook premises were not Dr. Shinderman's personal papers and effects, they were CAP's.  Thus, his standing to object to the search of CAP's premises depends on the reasonableness of his expectation of privacy in CAP's Westbrook premises or, more narrowly, in the area from which the records were seized. Mancusi v. DeForte, 392 U.S. 364, 367 (1968).  The current record is inadequate to determine exactly what records we are talking about or where they were seized from.  In Mancusi, the Supreme Court held that a Union officer had standing to object to a search of his shared office, including "a desk or a filing cabinet,"  from which certain documents were seized.  Id. at 70 (drawing an analogy to Jones v. United States, 362 U.S. 257 (1960)), where the defendant was an occasional occupant of an apartment with his own key and had standing to challenge a search of a public area of the apartment).  Because the record does not indicate exactly what papers and effects were seized from what locations, it is currently not possible to tell if the circumstances surrounding the execution of the search warrant in this case conferred on Dr. Shinderman the standing to object.  See United States v. Anderson, 154 F.3d 1225, 1229 (10th Cir. 1998) (disagreeing with the proposition that a corporate officer with a master key to the corporate premises has standing to seek suppression of evidence seized from anywhere in the building); United States v. Mancini, 8 F.3d 104, 109 (1st Cir. 1993) ("We consider the following factors to be especially relevant to the standing determination:  "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of

privacy; and the objective reasonableness of such an expectancy under the facts of a given case.") (collecting cases).  I note that in one of his motions where he contends that the case against him concerns only *de minimus* offenses, Dr. Shinderman refers to himself as "a consultant for CAP Quality Care on loan from the Center for Addictive Problems in Illinois." (Def.'s Mot. in Limine at 14, Docket No. 36.)  In his motion to suppress, however, he asserts that he is also CAP's "sponsor and national medical director."  (Mot. to Suppress at 2, Docket No. 34.)  I see no reason for a hearing to determine standing because I conclude that the motion must fail on the merits, assuming that Dr. Shinderman has standing to raise these issues.

### 2.      *Probable Cause*

Dr. Shinderman argues that all information obtained by Special Agent Hafener in violation of the regulations pertaining to confidential patient records should never have been incorporated into his search warrant affidavit and that, without that information, probable cause was lacking.  (Id. at 3.)  The objectionable information he speaks of are all "substance abuse treatment records and confidential communications."  (Id.)  Again, it is not easy to determine exactly what information is at issue.  I have already concluded that Hafener's review of records containing patient identifying information was proper because he had subpoena authority and regulatory authority to review patient identifying information.  Moreover, by the time the search warrant application was submitted to the Court (September 5, 2003), the Court had already authorized the United States to use in its criminal investigation the records gathered by Hafener up to that date, including patient identifying information.  Accordingly, contrary to Dr. Shinderman's sole asserted ground for questioning the Court's probable cause determination, there are no unauthorized disclosures of patient identifying information that must be excised from the search warrant affidavit.

### 3.    *Breadth of Electronic Search*

Dr. Shinderman next asserts that the search authorized by the warrant was an overbroad and general search because it permitted the United States to seize and search all computers found at CAP for any and all electronically stored data found on them, without regard to whether the computers were related to the alleged criminal activities, and in pursuit of an extraordinarily broad investigation of eleven alleged crimes.  (Mot. to Suppress on Constitutional Grounds at 3-4 & n.4.)  Dr. Shinderman asserts upon information and belief that the United States created mirror images[8] of CAP's electronic data storage devices and has been conducting searches of that data "repeatedly since that time."  (Id. at 4-5.)  The case Dr. Shinderman chiefly relies on is In re Two Administrative Subpoenas Duces Tecum Served Upon Steven P. Amato, No. 05-MC-29- P-DMC, 2005 U.S. Dist. LEXIS 11867, 2005 WL 1429743 (D. Me. June 17, 2005) (Mag. J. Cohen rec. dec. aff'd over objection).  The Government responds that the warrant was properly limited because it gave authority to seize only "items evidencing the criminal violations" and only for the period of time between August 2001 and the day the warrant was executed.  (Gov't Response at 29.)

The warrant limited the Government's authority to seize as follows:

SCHEDULE A
ITEMS TO BE SEIZED

The following records, documents, documentation materials, and items relating to the crimes of health care fraud (18 U.S.C. § 1347); false statements (18 U.S.C. § 1001); false statements related to health care matters (18 U.S.C. § 1035(a)); obstruction of department proceedings (18 U.S.C. § 1505); destruction, alteration, and falsification of records in federal investigations (18 U.S.C. § 1519); presenting a claim for a physician's service knowing that the individual

---

[8]    A mirror image is sometimes referred to as a "bitstream copy."  Essentially, investigators make a duplicate copy of "every bit and byte on the target drive including all files, the slack space, Master File Table, and metadata in exactly the order they appear on the original.  . . . .  The bitstream copy can then be saved as a 'read only' file so that analysis of the copy will not alter it."  Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 541 (2005).

was not a licensed physician (42 U.S.C. § 1320a-7b(a)(5)); false statements used in determining rights to payments under a federal health care program (42 U.S.C. § 1320a-7b(a)(2)); unlawful distribution of controlled substances, including, but not limited to, methadone (21 U.S.C. § 841(a)(1)); using, in the course of distribution or dispensing a controlled substance, a registration number belonging to another person (21 U.S.C. § 843(a)(2)); furnishing false and fraudulent material information in records required by the DEA (21 U.S.C. § 843(a)(4)(A)); and using a communication facility to violate the federal drug laws (21 U.S.C. § 843(b)), for the time period August 2001 to the present, including, but not limited to:

. . .

(c)  Electronic mail, electronic messages . . . [and]

(o)  Any and all electronic data processing and storage devices, computer, and computer systems and the information and/or data contained therein, including, but not limited to:
[All hardware devices capable of storing electronic data, software, documentation, passwords, and all electronically stored data of whatever kind found therein or thereon.]

(Search Warrant Schedule A.)

The Fourth Amendment requires that all warrants particularly describe the items to be seized in order to prevent the wholesale rummaging of a person's property in search of contraband or evidence of a crime.  United States v. Upham, 168 F.3d 532, 535 (1st Cir.1999). Under the particularity requirement "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant."  United States v. Guarino, 729 F.2d 864, 867 (1st Cir. 1984) (quoting Marron v. United States, 275 U.S. 192, 196 (1927)).

The requirement of particularity arises out of a hostility to the Crown's practice of issuing "general warrants" taken to authorize the wholesale rummaging through a person's property in search of contraband or evidence.

The cases on "particularity" are actually concerned with at least two rather different problems: one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take . . . and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized[.]

Upham, 168 F.3d at 535 (citations omitted). Dr. Shinderman's motion is premised on an assertion of overbreadth.

30

In <u>United States v. Roche</u>, 614 F.2d 6 (1st Cir. 1980), the Court of Appeals for the First Circuit affirmed the suppression of items seized pursuant to a warrant that authorized a broad seizure of items evidencing a fraud, without particularizing the fraud being investigated and without any temporal limitation.  <u>Id.</u> at 7.  Similarly, in <u>In re Application of Lafayette Academy, Inc.</u>, 610 F.2d 1 (1st Cir. 1979), the Court of Appeals affirmed the suppression of items seized where the warrant authorized a seizure of any items evidencing "any type of federal conspiracy or fraud," without describing the nature of the fraud or conspiracy that was being investigated "in order to delimit the broad categories of documentary material" that might otherwise be subject to the warrant.  <u>Id.</u> at 3.  Unlike the warrants under scrutiny in those cases, the search warrant in this case authorized the seizure of electronic storage devices and electronic data on the condition that they "relate" to a list of eleven offenses.  Among these offenses were several relatively targeted offenses, such as "presenting a claim for a physician's service knowing that the individual was not a licensed physician" and "unlawful distribution of controlled substances, including, but not limited to, methadone" and "using, in the course of distribution or dispensing a controlled substance, a registration number belonging to another person."  As for these activities, it is apparent that the search warrant was not overbroad.  The mere fact that a search of CAP's electronic data for evidence of these crimes might require a thorough review of potentially any and all electronic files is not itself a problem, because the purpose of recovering evidence of the foregoing specific crimes prevents the search from amounting to "rummaging."  On the other hand, the search warrant also identified two crimes that are potentially very broad in scope: "health care fraud" and "false statements."  My reading of the search warrant is that these broader category crimes are meant to pertain to the narrower category crimes, without extending beyond them.  There is no suggestion in the record why recitation of the crimes of "health care fraud"

and "false statements" would be likely to lead to the seizure of a broader collection of computer equipment or data than would otherwise have been seized.

The harm asserted by Dr. Shinderman is that the government is free to rummage the mirror images with impunity. [9]  The difficulty in analyzing this issue satisfactorily is that the government would have been entitled to create the mirror image in order to search for evidence of the specific crimes set forth in the warrant, even if the search warrant made no mention of the fraud and false statement crimes.  Additionally, the concern over whether the government might have engaged or might yet engage in exploratory rummaging would be present regardless of the existence of the reference to health care fraud and false statements, because it was permissible for the government to generate the mirror images of CAP's electronic data in order to conduct a search for evidence of the specific crimes identified in the search warrant.  See United States v. Upham, 168 F.3d 532 (1st Cir. 1999) (evaluating and approving of an off-site search of a computer system where the warrant clearly authorized the seizure of the system).  Moreover, electronic searches for evidence of these specific crimes would already entail thorough reviews

---

[9]   A search of a bitstream copy for evidence of crimes beyond those raised in the search warrant affidavit is not unconditionally prohibited.  If the government were to discover evidence of additional crimes in the ordinary course of its search for evidence of the targeted crime(s), it could petition the Court for permission to expand the scope of the warrant or apply for a new warrant based on a new evidentiary presentation.  See, e.g., United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999).  According to the Carey Court:

> [C]ourts can acknowledge computers often contain 'intermingled documents.'  Under this approach, law enforcement must engage in the intermediate step of sorting various types of documents and then only search the ones specified in a warrant.  Where officers come across relevant documents so intermingled with irrelevant documents that they cannot feasibly be sorted at the site, the officers may seal or hold the documents pending approval by a magistrate of the conditions and limitations on a further search through the documents.  The magistrate should then require officers to specify in a warrant which type of files are sought.

172 F.3d at 1275 (citation omitted).  See also Kerr, supra note 7, at 565-66 (summarizing how the "environment of digital evidence raises special concerns about general searches" and recommending that courts address the concern by regulating the admissibility of evidence after it is obtained, rather than by placing restrictions on the types of searches that may be conducted) & 571-584 (offering a more detailed discussion of approaches taken by courts to date).   Note, too, that if an item of evidence appeared in the case that seemed likely to be the fruit of an exploratory search of CAP's mirror image data, it would remain for Dr. Shinderman to establish that the evidence came from a computer system or electronic database in which he, personally, had a reasonable expectation of privacy.

of the files and data contained on the mirror images. Courts have upheld thorough searches of entire computer systems for purposes of finding image files depicting child pornography. See, e.g., id. at 535 ("[I]t is no easy task to search a well-laden hard drive by going through all of the information it contains, let alone to search through it and the disks for information that may have been 'deleted.'"). If it is reasonable to scour an entire computer system for digital images depicting child pornography, it is certainly reasonable to do the same in order to root out evidence of white collar crime, the relevance of which is not so likely to jump off the screen. Indeed, the fact that the government's investigation concerns white collar crime and the alleged falsification of computerized records tends to undermine the overbreadth challenge even with regard to the search warrant's reference to the broader categories of "health care fraud" and "false statements." See Andresen v. Maryland, 427 U.S. 463, 481 n.10 (1976) ("The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession."); United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982) ("[I]n cases . . . involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the 'paper puzzle.'"); United States v. Maali, 346 F. Supp. 2d 1226, 1240 (M. D. Fla. 2004) ("In complex financial cases, the need to assemble a 'paper puzzle' has been recognized and breadth in warrant provisions has been tolerated."). There can be little doubt that the electronic puzzle in a so-called white collar crime is even more puzzling than the proverbial paper puzzle of old.

Dr. Shinderman argues that the government was required by the Fourth Amendment to spell out in the search warrant the exact methodology officers would use to search the mirror

image data seized from CAP's computer systems.  The government contends that it did provide a

methodology, citing the search warrant affidavit, paragraph 90.  I conclude that the government

did not describe any methodology that it intended to limit itself to in either the warrant or the

affidavit, although the affidavit does suggest a general approach to be taken for the analysis of

electronically stored data, without unduly limiting the Government's ability to search the data.  In

any event, the affidavit was not incorporated by reference into the warrant, so the warrant must

be judged on its own.  United States v. Morris, 977 F.2d 677, 681 n.3 (1st Cir. 1992) ("An

affidavit may be referred to for purposes of providing particularity if the affidavit accompanies

the warrant, and the warrant uses suitable words of reference which incorporate the affidavit.").

I conclude that the omission of a search methodology from the search warrant does not require

the suppression of any fruit of the search of the mirror image because there is no Fourth

Amendment requirement that search warrants spell out the parameters of computer searches

where the warrant provides particularity as to what is being searched for.  Upham, 168 F.3d at

537 ("The . . . warrant did not prescribe methods of recovery or tests to be performed, but

warrants rarely do so.  The warrant process is primarily concerned with identifying what may be

searched or seized--not how--and whether there is sufficient cause for the invasion of privacy

thus entailed."); see also United States v. Brooks, 427 F.3d 1246, 1251 (10th Cir. 2005) (holding

that officers must describe with sufficient particularity the objects of their search, but not a

specific search methodology); United States v. Maali, 346 F. Supp. 2d 1226, 1247 (M.D. Fla.

2004) (asserting that the "better practice" would have been to present a search methodology to

the magistrate judge in conjunction with the search warrant application, but holding that the

failure to do so did not render search warrants insufficiently particular); see also Kerr, *supra* note

7, at 575-76 (criticizing the idea that search protocols should be incorporated into search

warrants targeting computer data because, *inter alia* , "even a skilled forensic expert cannot predict exactly what techniques will be necessary to find the information sought by the warrant"). I conclude that the warrant was not overbroad in its authorization to seize CAP's computers and data storage media generally because there was no practical way for officers to have identified, in advance, which particular hard drives or backup tapes at CAP were most likely to contain evidence of the crimes at issue, much less which sectors, partitions, directories or files, would store such evidence.[10]

The analysis I have put forth above is in tension with Magistrate Judge Cohen's order granting, in part, a motion to quash an administrative subpoena in <u>Amato</u>. In that case, Magistrate Judge Cohen concluded that an administrative subpoena *duces tecum* was facially overbroad, and therefore unenforceable under the Fourth Amendment, because it called for the turnover of all computer equipment "with no express safeguard against a subsequent rummaging through, and seizure of, irrelevant as well as relevant data." 2005 U.S. Dist. LEXIS 11867, *40. Although Magistrate Judge Cohen observed that the Government had not sought to make a bitstream copy in that case, <u>id.</u> at *11, his ruling did not turn on that fact. Instead, he appeared to have required that the subpoena must specify the way in which any subsequent search would be conducted in order to avoid rummaging. <u>Id.</u> at *40. It is tempting to want to distinguish this

---

[10]       As the Government succinctly puts it, "the search warrant was limited to information from CAP covering a reasonable period of time and limited to the criminal violations being investigated." (Gov't Response at 29.) The Government also cites a collection of cases in support of the proposition that "[e]ven if the warrant was overbroad, the appropriate remedy would be suppression of the evidence beyond the [permissible] scope of the warrant, not blanket suppression of all evidence seized under the warrant." (<u>Id.</u> at 31.) The cases cited, <u>United States v. Falon</u>, 959 F.2d 1143, 1149 (1st Cir. 1992), and <u>United States v. Riggs</u>, 690 F.2d 298, 299-300 (1st Cir. 1982) (adopting the "partial suppression" rule), do stand for this proposition. <u>See also United States v. London</u>, 66 F.3d 1227, 1237-38 (1st Cir. 1995); <u>United States v. Morris</u>, 977 F.3d 677, 682 (1st Cir. 1992). Despite some troubling language in Attachment A to the Search Warrant, this case is not about seizing hardware devices, other than the temporary on site seizure for the purpose of obtaining the mirror image. At the present time there is no factual basis to determine what evidence may have been obtained from searching the mirror image or bitstream copy that lacked a nexus with the Government's probable cause presentation. In the event that the Court rejects my recommendation that the warrant was not overbroad under the circumstances of this investigation, a hearing would be required in order to determine whether there exists any offending evidence for the partial suppression rule advanced by the Government to apply to.

case from <u>Amato</u> on the ground that <u>Amato</u> presented a subpoena "burdensomeness" issue, because turning over a computer system or network could prevent a business from functioning and a less intrusive alternative was readily available (having the Government create a bitstream copy).  However, Magistrate Judge Cohen specifically concluded that the subpoena was facially overbroad for purposes of the Fourth Amendment because it did not limit the computer equipment that could be seized or specify how it might be searched.  I note that not all authorities cited in <u>Amato</u> call for "express safeguards" to be placed in search warrants in order to limit the scope of a search of electronic data or for the Government to identify in advance a limited category of computer equipment subject to a physical seizure.  I also observe that there is no practical way for the Government to know, on the date a warrant is executed, what select electronic data or files should be "seized" and what should not be (other than to say data that constitutes evidence of a crime generated within a specified timeframe), or to itemize, in advance, what particular files will need to be searched or how they should be searched.  In any event, neither <u>Amato</u> nor this recommendation bind the Court with respect to its resolution of the pending motion.  Ultimately, I conclude that the warrant in this case was not overbroad because the temporary physical seizure of computer equipment or, as it happened in this case, the acquisition and retention of a bitstream copy of the data found thereon were both reasonable means of enabling the Government to achieve the objective of the search warrant: to search for and ultimately "seize" or gather evidence of the crimes set forth in the warrant.[11]

Despite this conclusion, the concern for rummaging is a legitimate one.  The Court may wish to impose a reporting obligation on the government so that Dr. Shinderman can obtain some idea what material documents or other data the Government has obtained as a result of searching

---

[11]    Note that Dr. Shinderman does not challenge Magistrate Judge Brownell's finding that probable cause existed to search CAP's computer systems for digital evidence stored thereon.  Relevant paragraphs from the search warrant affidavit include paragraphs 9, 12, 21(i), 35-38, and 80-90.

the bitstream copies it collected from CAP's computer systems and what search criteria were used to obtain them.  Unless such a reporting requirement is imposed, there is no real means for the defendant or the Court to identify problems in advance of trial, although I note that the Government's case against Dr. Shinderman, judging from the indictment, does not appear to have expanded beyond its probable cause presentation.  For present purposes, I recommend that the Court deny Dr. Shinderman's motion to suppress "all fruit" of the computer-related portion of the search warrant based on his overbreadth challenge.

## C.     First Motion for Franks Hearing (Docket No. 37)

With his Franks motion, Dr. Shinderman challenges the propriety of a representation made in the government's *ex parte* motion for an order permitting seizure of confidential medical records (Docket No. 37, Ex. B), which was filed with the Court in conjunction with the government's search warrant application.  Dr. Shinderman takes issue with the government's assertion that it was entitled to obtain records from CAP containing "confidential communications" because disclosure of such communications was "necessary in connection with the investigation or prosecution of an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury."  (Id. at 12, quoting 42 C.F.R. § 2.63(a)(2).)  Like patient identifying information, confidential communications are another category singled out for special treatment under the regulations protecting drug abuse patient records.  In particular, Dr. Shinderman asserts that it was a known falsehood for Special Agent Hafener to assert in his search warrant affidavit that CAP's methadone treatment and drug dispensing practices were believed to be connected to life-threatening methadone overdoses and overdose deaths in Southern Maine.  (Id. at 13, relying on Hafener Search Warrant Aff. ¶¶ 6-7, 28.)  The affidavit asserts the following:

6.  Since about August 2002, I [Special Agent Hafener] have been involved in an investigation of methadone clinics in Southern Maine prompted by the large number of overdose and overdose death cases attributable to the diversion of methadone from such clinics.  Methadone is a Schedule II controlled substance.  See 21 C.F.R. 1308.12(C)(15).  Of 374 drug related deaths in Maine from 1997 through 2002, methadone is mentioned as a cause of death (alone or in combination with other drugs) in 33% of all deaths caused by narcotics. See August 6, 2003 testimony of Dr. Marcella Sorg, RN, PhD, D-ABFA, before the Senate Committee on Governmental Affairs, Legal Drugs, Illegal Purposes: The Escalating Abuse of Prescription Medications (the "Senate Hearing").  In 2002, a large spike in life-threatening opiate-abuse encounters was observed by the Maine Emergency Medical Services, increasing to a rate of about one patient every day, and was believed to have been caused by, among other factors, the availability of methadone as a drug of abuse, large quantities of illicitly available methadone, and the utilization of methadone as a recreational drug of abuse; "high-dose" methadone and methadone diversion to non-clinic patients appeared to be common threads in many (but not all) of the emergency patient encounters. August 6, 2003 testimony of Dr. John H. Burton, MD, Medical Director, Maine Emergency Medical Services, at the Senate Hearing.

7.  Since about October 2001, CAP . . . has been providing among other strategies, high-dose methadone treatment strategies, at is methadone maintenance treatment facility in Westbrook, Maine.  . . . .

8.  In November 2002, I opened an investigation of CAP to determine if CAP complied with Medicaid regulations and other federal regulations pertaining to take-home methadone.  That investigation revealed numerous violations of Medicaid regulations including that CAP submitted more than 2,000 claims to Medicaid for non-covered services because CAP: (1) failed to provide individualized treatment plans to Medicaid clients; (2) failed to review treatment plans of Medicaid clients every 90 days; (3) failed to provide necessary counseling to Medicaid clients; (4) failed to adequately document counseling services provided to Medicaid clients; and (5) failed to provide discharge summaries and aftercare plans to Medicaid recipients and failed to complete discharge summaries within the time period required by law.  . . . .
. . . .
28.  I have set forth below examples of instances when CAP provided split doses to Medicaid clients that . . . did not meet the . . . criteria for take-home doses:
. . . .
e.  . . . .  PME021 began receiving split-dose take-home doses on January 16, 2002.  PME021's boyfriend died of a methadone overdose on February 24, 2002 after consuming PME021's split-dose take-home dose.
. . . .
f.      PME012 started treatment at CAP on March 28, 2002 as a new patient and began receiving seven day per week split-dose take-home

doses on July 1, 2002 . . . .  [Her] split-dose take-homes ended on July 9, 2002 after she diverted methadone that resulted in a death.  . . . .
. . . .

48.  Federal and state regulations require that patients receive a fully document [sic] physical evaluation prior to entering treatment at a methadone clinic.  During the June 20, 2003 on-site review of CAP, I obtained a copy of Medicaid recipient PME145's treatment records.  A Nursing Intake form, dated 10/22/02, was included in those records, and reflected that PME145 had . . . received an intake physical evaluation.  As explained below . . . I believe that PME145's Nursing Intake form was created after PME145's methadone overdose death to conceal the fact that PME145 had not received an intake physical.

49.  CAP records reflect that PME145 began methadone treatment on October 22, 2002.  Police and medical examiner reports reflect that PME145 died on October 25, 2002, of acute methadone toxicity.  Police reports reflect that an appointment card from CAP for PME145 was . . . seized . . . at the scene [and] revealed that PME145 was scheduled to receive a physical on October 24, 2002.  A handwritten [n]ote dated 10/24/02 in PME145's CAP records . . . provides, "Need to reschedule intake physical as pt presents (with) severe migraine (and) vomiting . . . reschedule appt when feeling better."  PME145's husband also gave MDEA a second appointment card for PME145 . . . reflecting that PME145 had a physical scheduled for 10/28/02.
. . . .

83.  A review of the reconciliation reports from CAP consistently indicated discrepancies between the physical count and the DoPi [(computer)] count, despite the fact that these counts should have been identical.  One of the most outstanding discrepancies was an overage of 56,565 mgs. or 1414 tablets of 40mg Methadone for the week of 11/12/01 through 11/18/01 (week #14).  This discrepancy reflects that the physical count of methadone was 56,565mgs less than the DoPi count.  Even given instances of human error, the information input into the DoPi system should accurately reflect what is physically dispensed each day. . . . .

(Docket No. 37, Ex. A.)  In reliance on these factual assertions the government stated in its

motion for disclosure of confidential communications that there was evidence that CAP's

methadone treatment practices contributed to the risk of overdose death or other overdose injury

in the Southern Maine community, referencing CAP's dispensing of split-dose take-home doses

of methadone to clinic patients who did not satisfy the regulatory prerequisites, three overdose

deaths that could be connected with take-home methadone doses dispensed by CAP, and the

assertion that CAP's records failed to account for more than 50,000 mg of methadone.  (Docket No. 37, Ex. B at 14.)

Dr. Shinderman contends in his Franks motion that the suggestion in the affidavit of a connection between CAP's practices and "an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury," was specious because Ann Levesque, a licensing specialist with the Maine Bureau of Developmental Services (now consolidated within the Maine Department of Health and Human Services) who participated in a task force review of CAP's take-home methadone treatment practices in early 2002, asserts that the task force concluded in a written report that CAP was appropriately handling its take-home methadone program.  (Decl. of Ann Levesque ¶¶ 1-13, Docket No. 37, Ex. C.)  Ms. Levesque opines in her declaration that "the spike of methadone overdose deaths in the Portland area during this period was largely attributable to the availability of methadone from pain management doctors as well as the growth of the illicit drug trade."  (Id. ¶ 14.)  Additionally, Ms. Levesque relates that she spoke with Assistant U.S. Attorney Evan Roth in January 2003 and informed him of the task force report and of her "own conclusion that the prescribing practices of pain management doctors and the growth of the illicit drug market, and not CAP . . ., were the most significant sources of diversion resulting in the increase of methadone-related overdose deaths."  (Id. ¶ 16.)  According to Ms. Levesque, Mr. Roth informed her the following month that he had a copy of the task force report. (Id. ¶ 17.)  Ms. Levesque also asserts that she spoke with a fraud investigator in the U.S. Attorney's Office and also with Special Agent Hafener about the task force report and about her own conclusion that CAP's practices were not a contributing factor in the growth of methadone-related overdoses and overdose deaths in Southern Maine.  (Id. ¶¶ 26-27, 30-33.)  Ms. Levesque concedes in her declaration that "there were some problems with area clinics" (id. ¶ 27), but

implies with the balance of her declaration that it was unreasonable for Special Agent Hafener or the United States to think that CAP's practices could be a contributing factor in the growth of overdose incidences.

Based on the facts related by Ms. Levesque, Dr. Shinderman argues that the Government in its motion and Special Agent Hafener in his affidavit deliberately misled the Court in order to obtain for prosecutors access to confidential communications made by CAP's patients.  He also highlights as probative of a deceitful intent the fact that neither the United States nor Hafener made any mention in their submissions to the Court of any reports that had been issued by the task force or by other researchers on the topic.

What is at stake in the Franks motion are any "confidential communications" made by CAP's drug abuse patients to CAP "in the course of diagnosis, treatment, or referral for treatment."  42 C.F.R. § 2.63.  Like "patient identifying information," the federal regulations also protect "confidential communications" from disclosure, but access to confidential communications is even more limited.  In order for a court to authorize disclosure of confidential communications, it must find that:

> (1) The disclosure is necessary to protect against an existing threat to life or of serious bodily injury, including circumstances which constitute suspected child abuse and neglect and verbal threats against third parties;
>
> (2) The disclosure is necessary in connection with investigation or prosecution of an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury, including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, or child abuse and neglect; or
>
> (3) The disclosure is in connection with litigation or an administrative proceeding in which the patient offers testimony or other evidence pertaining to the content of the confidential communications.

Id.  In its motion to obtain access to such communications, the United States asserted that disclosure was appropriate under the second of the three alternative conditions.  Dr. Shinderman

wants a hearing to challenge whether the United States made this assertion in good faith, hoping to raise the Court's ire so that it will exercise its discretion to suppress evidence in order to deter serious police misconduct.  (Docket No. 37 at 6.)  I conclude that there is no reasonable prospect of this occurring because the alleged misrepresentations and omissions do not undermine the Court's probable cause finding.

To begin, the declaration of Ann Levesque does not even suggest impropriety on the part of the Government.  The fact that Ms. Levesque and the task force of which she was a member drew different conclusions (or perhaps even similar conclusions) as to the *primary* cause of the growth in methadone-related overdoses in the Southern Maine community does not tend to establish that Special Agent Hafener deliberately misled the Court through misstatements or omissions.  Furthermore, even if Ms. Levesque personally concluded that CAP's contribution to the problem was negligible, her assertions do nothing to undercut Special Agent Hafener's assertions regarding three specific deaths in 2002 that he could reasonably conclude were related to CAP's dispensation of methadone.  Additionally, one of the reports appended to Levesque's declaration tends to corroborate Hafener's concern over the diversion of methadone dispensed in take-home doses to methadone clinic patients.  (Sept. 2003 Report of the Maine Office of Substance Abuse at 12, Levesque Decl. Ex. C.)[12]

"[A] Franks hearing is required 'where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'"  United States v. Santana, 342 F.3d 60, 66 (1st Cir. 2003) (quoting Franks v. Delaware, 438 U.S. 154, 155 (1978)).  I conclude that Dr. Shinderman

---

[12]      The report relates that Robert Heimer, Ph.D., found in his 2002 Yale University Study that "[h]alf of the illegal methadone was reported to be from pain prescriptions and half from treatment clinics."

fails to make a substantial preliminary showing that Special Agent Hafener knowingly, intentionally or recklessly made a false statement or withheld material information.  Without determining whether the § 2.63 "extremely serious crime" standard was actually met in the United States' motion for disclosure, the factual assertions related to three overdose deaths that could be traced back in some fashion to CAP's dispensation of take-home methadone treatments under circumstances that did not comply with governing regulations are uncontroverted[13] and they provided at least adequate grounds for the Government to make the assertion that the "extremely serious crime" standard was met.  The Court, at that point, was the arbiter of whether those facts met the regulatory standard and concluded that they did.  I do not see how it was misled into that finding.  Finally, the issue of whether an "extremely serious crime" was being investigated pertained only to the Government's motion for disclosure, not its search warrant application.  Even if the factual assertions were stricken from Hafener's affidavit, the finding that probable cause existed to grant the search warrant application would not be undermined.

D.      **Motion in Limine (Docket No. 36)**

        With his motion in limine Dr. Shinderman argues that the United States "does not currently have the prerequisite authority from a court to make further disclosures of substance abuse treatment records or confidential patient communications, including testimonial evidence by current or former patients, at trial," and asks that the Court exclude any such evidence from trial on the ground that the United States cannot satisfy the requirements for introduction of such evidence and on the ground that "the alleged conduct by Dr. Shinderman does not by any means outweigh the significant public interest in maintaining the secrecy of confidential communications in the context of substance abuse treatment." (Mot. in Limine at 3, 15.)  The

---

[13]     Dr. Shinderman's Franks motion does not make any showing regarding whether CAP dispensed methadone to the three patients associated with the three overdose deaths under circumstances that violated federal criminal law.

Government's response is terse.  It simply asserts that the Court's prior orders authorizing

disclosure of records implicitly authorized the use of such records for all purposes of a

prosecution.  (Gov't Response at 22.)  Additionally, the Government asserts that Dr. Shinderman

does not have standing to advocate for the confidentiality rights of CAP's patients.  (Id.)  In the

Government's view, the Court should not rule on the admissibility of any record until it is

introduced at trial.  (Id.)  As for patient testimony, the Government asserts that nothing in the

regulations would prevent a patient from testifying at trial.  (Id. at 23.)  In reply, Dr. Shinderman

says his right to object arises from the fact that he meets the regulatory definition of a

"program."[14] (Def.'s Reply at 17-18, Docket No. 48.)  He states that he is "entitled to a pre-trial

determination of whether the Government can meet its burden of justifying the disclosures for

the purposes of prosecution."  (Id. at 19, citing 42 C.F.R. §§ 2.64(d), 2.66(a)(2) & 2.66(c).)

The threshold question is whether the Court's orders of April 24, 2003, August 22, 2003,

and September 5, 2003, have already authorized the introduction or presentation of confidential

records at trial.  The Government references paragraph 5 of each order.  Those paragraphs state

that "the United States shall delete patient identifying information from any documents made

available to the public."  (See Docket No. 40, Exs. C, D & E.)  According to the Government,

paragraph 5 of the orders would be rendered meaningless if it were read in a manner that did not

authorize disclosure to a jury in a criminal prosecution.  (Gov't Response at 23.)  However, I find

---

[14]         Pursuant to 42 C.F.R. § 2.66(b):

> (b)  Notice not required.  An application under this section may, in the discretion of the court,
> be granted without notice.  Although no express notice is required to *the program*, to the person
> holding the records, or to any patient whose records are to be disclosed, upon implementation of
> an order so granted *any of the above persons* must be afforded an opportunity to seek revocation
> or amendment of that order, limited to the presentation of evidence on the statutory and regulatory
> criteria for the issuance of the court order.

Id. § 2.66(a)(1) (emphasis added).  Dr. Shinderman has not suggested that he qualifies as "the person holding the records" for purposes of subsection (b).  Instead, he contends that he qualifies as a program.  I agree with this classification because the regulations define a program to include "[a]n individual . . . who holds [him]self out as providing, and provides, alcohol or drug abuse diagnosis, treatment or referral for treatment."  Id. § 2.11.

44

more informative paragraph 3 of the orders.  In the April and August orders, the language is as follows:  "[A]ccess to the records shall be limited to the United States and federal law enforcement personnel involved in the investigation, and to such experts as the United States may need to consult to analyze, interpret or organize the information contained in the records."  In the September order, the language is expanded, but still does not extend to use or disclosure at trial:  "[A]ccess to the seized records shall be limited to: (a) the United States and federal law enforcement personnel, as well as the State of Maine Pharmacy Inspectors, who are involved in the investigation; (b) any federal Grand Jury investigation . . .; (c) such experts as the United States may need to consult . . .; and (d) current and former employees of CAP . . . ."

In my view, Dr. Shinderman is correct in his assertion that the Government does not presently have Court authorization to use confidential patient records at trial and that it is incumbent upon the Government to establish that it has devised an adequate approach to introducing confidential records and patient testimony that will not undermine the confidentiality protected by the regulatory framework.  I do not believe, however, that a comprehensive hearing or a ruling to exclude all confidential records and patient testimony is called for at this juncture in the context of Dr. Shinderman's motion *in limine*.  At the same time, however, I do not believe that these interests can be adequately accounted for on an *ad hoc* basis during the course of a trial.  Perhaps what is called for is an order to show cause that requires the Government to make an evidentiary proffer capable of enabling the Court to assess exactly what evidence the Government anticipates introducing that will implicate the confidentiality interests protected by the regulatory framework and how the Government proposes to limit disclosure to that evidence necessary to the prosecution.

For purposes of the instant dispute, the confidential records "of the identity, diagnosis, prognosis, or treatment of any patient . . . shall . . . be disclosed only for the purposes and under the circumstances expressly authorized . . . ." 42 U.S.C. § 290dd-2(a).  The pertinent purpose and circumstances in this case, at this juncture, are, respectively, the criminal prosecution of Dr. Shinderman and upon a "showing [of] good cause . . . including the need to avert a substantial risk of death or serious bodily harm."  Id. § 290dd-2(b)(2)(C).  According to the statute, "[i]n assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services."  Id. The statute distinguishes the use of records in criminal proceedings from the disclosure of records.  Compare § 290dd-2(b) and § 290dd-2(c).  With respect to the use of records in criminal proceedings, the statute conditions use upon a showing of good cause, but only with respect to a use "to initiate or substantiate any criminal charges *against a patient*."  Id. § 290dd-2(c) (emphasis added).  Other than, arguably, the subsection (b) provisions pertaining to "permitted disclosure," Congress did not condition the use of confidential records in criminal proceedings against individuals other than patients.

The regulations promulgated by the Department of Health and Human Services go a little further.  The confidentiality restrictions imposed by the Department preclude disclosure or use of "[t]he patient records to which the[] regulations apply" in any criminal proceeding conducted by any federal, state or local authority, except as otherwise authorized and, even then, only to the extent "necessary to carry out the purpose of the disclosure."  42 C.F.R. § 2.13(a).  This general proclamation regarding the confidentiality restrictions, thus, suggests that disclosure or use is restricted in any criminal prosecution against any defendant.  However, the immediately preceding section of the regulations, entitled "Applicability," differentiates, like the statute,

46

between "restrictions on disclosure" and "restrictions on use" and, as for the latter category, describes only "the restriction on use of information to initiate or substantiate any criminal charges *against a patient* or to conduct any criminal investigation *of a patient*," Id. § 2.12(a)(2) (emphasis added).  Based largely on this distinction, I conclude that a prohibition on use in a criminal prosecution of a doctor does not exist in the regulations.  The question, then, is what impact the restriction on "disclosure" has upon a criminal prosecution of a doctor.  The regulations define "disclosure" as "a communication of patient identifying information, the affirmative verification of another person's communication of patient identifying information, or the communication of any information from the record of a patient who has been identified."  Id. § 2.11.

I agree with the Government that the mere appearance of a patient witness at a trial for purposes of providing testimony would not amount to a disclosure (to the Court or the Jury) of patient identifying information *from a confidential record*.  However, the interplay between the presentation of a patient witness and the introduction of patient records holds open the possibility for "disclosures" that implicate the protections afforded under the regulations.  I therefore turn to sections 2.63 and 2.64 of the regulations which deal, more narrowly, with the conditions placed on "disclosures."

In the case of "confidential communications made by a patient to a program in the course of diagnosis, treatment, or referral for treatment," which receive the greatest protection under the regulatory framework, disclosure may be ordered where the "disclosure is necessary in connection with . . . prosecution of an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury, including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, or child abuse and neglect."  Id. § 2.63.  However,

disclosure may also be ordered "in connection with litigation . . . in which the patient offers testimony or other evidence pertaining to the content of the confidential communications." Id. § 2.63(a)(3).  In other words, the exact hypothetical that Dr. Shinderman says is most troublesome ("[d]rawing the records—and the patients—into a public forum") is expressly condoned in § 2.63, provided the Court orders beforehand that such disclosure is authorized. Id. § 2.63(a).  As for confidential communications by patients who do not testify, the mere redaction or coding of patient identifying information would prevent that patient's confidential communications from being compromised. Cf. 42 C.F.R. § 2.66(d)(1) ("An order [authorizing disclosure or use of patient identifying information] must require the deletion of patient identifying information from any documents made available to the public.").

Finally, it is apparent that the Government can readily meet the requirements for an order authorizing disclosure and use of records to prosecute Dr. Shinderman.  The regulatory criteria require the Court to weigh the public interest of prosecution against the potential injury to the patient, the physician-patient relationship and the treatment services. Id. § 2.66(c) (incorporating requirements of § 2.64(d) and (e)).  However, in view of the fact that the Court must limit disclosure to parts of a patient's record that are "essential" to the prosecution and must "include such other measures as are necessary to limit disclosure for the protection of the patient, the physician-patient relationship and the treatment services," such as redacting patient identifying information from records introduced at trial or "sealing from public scrutiny the record of any proceeding for which disclosure of a patient's record has been ordered," the potential for harm to the patient, patient-physician relationship or treatment services is minimized.  Still, the Court has an obligation to control the manner in which confidential records are used, even if the pending motion to exclude all evidence does not advance that objective.

**E.      Motion to Dismiss (Docket No. 38)**

This motion is designed to build on Dr. Shinderman's two motions to suppress, his

motion for a Franks hearing and his motion *in limine*, all of which are incorporated by reference.

The first assertion in the motion is as follows:

> If the Court sustains Dr. Shinderman's Motion to Suppress Evidence on Title 42
> Grounds or Dr. Shinderman's Motion in Limine, the Government will be
> incapable of proving beyond a reasonable doubt that he committed the offenses
> alleged by the indictment because all of its documentary and testimonial evidence
> will have been suppressed.

(Mot. to Dismiss at 4, Docket No. 38.)  Because I have recommended that the Court not grant

either the motions to suppress or the motion *in limine* I also recommend that the Court not grant

the motion to dismiss on the first ground raised by Dr. Shinderman.

The second argument for dismissal is that the undisputed facts exonerate Dr. Shinderman.

According to Dr. Shinderman, even if the Government proved that he prescribed methadone or

other drugs using Dr. Keefe's DEA registration number:

> the evidence would show that it was the result of two factors: (1) the confusion
> over the correct procedure to be followed by a practitioner who possesses a valid
> DEA registration for one state, but occasionally practices at a medical facility in a
> second state; and (2) a good faith attempt to conform to the regulations by
> operating under the umbrella of the medical director of the facility [Dr. Keefe] in
> the second state, where good faith is established by the legitimate purposes of the
> medications and the lack of compensation for the act of rendering the
> prescription.  If that is so, Dr. Shinderman is entitled to a dismissal of the
> indictment because his alleged conduct was induced by confusing government
> conduct, which is sometimes know as "estoppel by entrapment" or "estoppel by
> confusing government conduct." . . . .  Under the circumstances, the correct and
> equitable forum for a case of this type would be a referral to a professional board
> or registering authority for scrutiny . . . .

(Id. at 5-6, citing United States v. Conley, 859 F. Supp. 909, 926-29 (W. D. Pa. 1994).)  Two

pertinent facts can be drawn from Special Agent Hafener's September 5, 2003, affidavit:

1.      "According to the Maine Board of Licensure in Medicine, Marc S. Shinderman,

M.D., was issued a temporary license to practice medicine in the State of Maine on August 10,

2001, which expired on August 9, 2002."  (Hafener SW Aff. ¶ 20, Docket No. 34, Ex. A.)

2.      "Dr. Shinderman applied for a DEA registration number in Maine on August 31,

2001 and on July 10, 2002, but no DEA registration number in Maine was ever issued to him.

Without such a DEA registration number, Dr. Shinderman was not authorized by DEA to issue

prescriptions for controlled substances in Maine.  Shinderman held a DEA registration number

for his Illinois practice."  (Id. ¶ 78.)

Dr. Shinderman also points to a December 2004 DEA notice of proposed rulemaking in

which the DEA asserted:

> There is confusion regarding whether a practitioner who practices and is
> registered in one state and wishes to practice and prescribe in another state must
> register with DEA in the second state. DEA proposes to amend its regulations to
> make it clear that when an individual practitioner who practices and is registered
> in one state seeks to practice and prescribe controlled substances in another state,
> he/she must obtain a separate DEA registration for the subsequent state.

Clarification of Registration Requirements for Individual Practitioners, 69 Fed. Reg. 70,576

(Dec. 7, 2004) (referencing 21 U.S.C. § 822(e)[15] and 21 C.F.R. § 1301.12(b)(3)).  Dr.

Shinderman asserts that there can be no factual dispute but that he was one such confused

practitioner.

The allegedly confusing regulation reads as follows:

§ 1301.12 Separate registrations for separate locations.

---

[15]      The statute does not itself create any ambiguity:
(e) Separate registration.  A separate registration shall be required at each principal place of
business or professional practice where the applicant manufactures, distributes, or dispenses
controlled substances or list I chemicals.
21 U.S.C. § 822(e).

> (a) A separate registration is required for each principal place of business or professional practice at one general physical location where controlled substances are manufactured, distributed, imported, exported, or dispensed by a person.
>
> (b) The following locations shall be deemed not to be places where controlled substances are manufactured, distributed, or dispensed:
> . . . .
>     (3) An office used by a practitioner (who is registered at another location) where controlled substances are prescribed but neither administered nor otherwise dispensed as a regular part of the professional practice of the practitioner at such office, and where no supplies of controlled substances are maintained.

21 C.F.R. § 1301.12.  I conclude that the matter cannot be addressed dispositively by the Court at this time.  The estoppel-by-entrapment defense requires a showing that (1) a governmental official told the defendant that his conduct was legal; (2) the defendant relied on that representation; (3) his reliance was reasonable in the circumstances; and (4) given that reliance, it is unfair to prosecute the defendant for his conduct.  United States v. Villafane-Jimenez, 410 F.3d 74, 81 (1st Cir. 2004).  See also United States v. Ray, 411 F.3d 900, 903 (8th Cir. 2005) ("The government must have affirmatively misled the defendant for the defendant to put forth a viable defense of entrapment by estoppel; an incomplete explanation of the law does not suffice.").  Ordinarily, the defendant must establish the defense at trial.  Villafane-Jimenez, 410 F.3d at 80.

The indictment alleges that Dr. Shinderman used a DEA registration not belonging to him and that he falsified records in an attempt to prevent the fact from being ascertainable by authorities.  The alleged effort to disguise the violation—and Dr. Shinderman's assertion that he repeatedly applied for a registration for his work at CAP—permits an inference that Dr. Shinderman knew what he needed a separate DEA registration in order to prescribe certain drugs at CAP.  Additional factual issues that need to be resolved include whether Dr. Shinderman relied on the regulation and whether CAP is "an office . . . where no supplies of controlled

substances are maintained."  21 C.F.R. § 1301.12(a)(3).  I have in mind, too, the general

admonition against dismissing indictments in anything but extraordinary circumstances.  United

States v. Stokes, 124 F.3d 39, 44 (1st Cir. 1997) ("Because the public maintains an abiding

interest in the administration of criminal justice, dismissing an indictment is an extraordinary

step."); United States v. Morrison, 449 U.S. 361, 365 (1981) (concluding that the dismissal of an

indictment was unwarranted absent a constitutional violation that prejudiced defendant's case);

Whitehouse v. United States Dist. Court, 53 F.3d 1349, 1359 (1st Cir. 1995) ("When a federal

court uses its supervisory power to dismiss an indictment it directly encroaches upon the

fundamental role of the grand jury.  That power is appropriately reserved, therefore, for

extremely limited circumstances.").  I recommend that the Court deny the motion to dismiss.

## F.    Motion to Unseal and for Disclosure (Docket No. 39)

With his motion to unseal, Dr. Shinderman requests that the Court unseal and order the

Government to produce three categories of documents:

(1)     Any *ex parte* motions or applications filed in this Court by the Government to

obtain authorization to access and use CAP's confidential patient records related to

substance abuse treatment;

(2)     Any notices that the Government sent to CAP or Dr. Shinderman in connection

with the Court orders authorizing the disclosure of said documents to the Government;

and

(3)     Copies of any written consents that the Government has obtained from CAP

patients pursuant to 42 C.F.R. § 2.321 and in connection with its investigation or

prosecution of CAP or Dr. Shinderman.

(Mot. to Unseal, Docket No. 39.)  The Government responds that it has produced all relevant court orders (the three that are already on the Court's docket as exhibits to this motion) but objects that a fourth disclosure motion referred to by the parties varyingly as the Brunswick Naval Air Station motion, "BNAS " motion, or the September 9, 2003 motion, should not be unsealed and that no patient consents should be produced either.  The Government does not object to turning over all notices given to CAP and Dr. Shinderman and appears to have done so by appending them as exhibits to its consolidated response (Docket No. 45).  As grounds for objecting to the unsealing of the BNAS motion, the Government asserts that the regulations only require it to provide notice of the implementation of a court order granting disclosure and obliquely states that it "recognizes its continuing obligation to turn over <u>Brady</u>, <u>Giglio</u> and Jencks Act material in a timely fashion."  (Gov't Response at 38, citing 42 C.F.R. § 2.66(b).) The Government likewise asserts that Dr. Shinderman has no right to discovery of any patient consent forms.  (<u>Id.</u> at 39.)

In reply, Dr. Shinderman says he is entitled to review the BNAS motion because he shares with the public a common law right to access public records existing on the Court's docket.  (Def.'s Reply at 38, citing <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 597 (1978).[16])  The BNAS motion, in Dr. Shinderman's view, cannot remain sealed indefinitely without some cause and the Government has not made any suggestion as to what cause exists. (<u>Id.</u>)  He also professes a right to monitor the Government's compliance with the dictates of 42 C.F.R. § 2.31, which prescribes the manner in which patient consents must be drafted.  The Government's surreply does not address the motion to unseal.  (Gov't Surreply, Docket No. 52.)

As Dr. Shinderman suspects, the BNAS motion is not the only *ex parte* motion filed by the Government in the course of its various criminal investigations, more than two years old, that

---

[16]     Dr. Shinderman provides the correct citation but incorrectly calls the case <u>United States v. Nixo n</u>.

are still being maintained under seal on this Court's docket.  (See In re Medicaid Records and CAP Quality Care Records, 2:03-mc-34-DMC and In re E-Mail Records of the Brunswick Naval Air Station, 2:03-mc-78-WSB).[17]  My *in camera* review of the electronically available motions filed in those matters persuades me that it would not pose any risk to anyone's confidentiality for these matters to be unsealed at this time.  In addition, the Government has not presented any cause as to why unsealing these matters will undermine any ongoing investigation.  Thus, I conclude that these matters and the motions filed therein should be unsealed in recognition of the public's presumed right to access documents filed on the Court's docket.  In Nixon v. Warner Communications , the Supreme Court recognized the existence of a common law "general right to inspect and copy public records and documents, including judicial records and documents," which has been denied in only limited circumstances, including (1) where access would be "used to gratify spite or promote public scandal"; (2) where records disclosed might serve as "reservoirs of libelous statements for press consumption"; or (3) "as sources of business information that might harm a litigant's competitive standing."  435 U.S. at 597-598 (citation omitted).  Nevertheless, "[e]very court has supervisory power over its own records and files."  Id. at 598.  This Court does not presently have a local rule governing the conditions on which papers filed under seal by the Government in connection with an investigation will be made available to the public.  I therefore look to the common law standards developed in the courts.  The presumption of public access "stems from the premise that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system."  Siedle v. Putnam Invs., 147 F.3d 7, 9-10 (1st Cir. 1998) (citation omitted).  "Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access.  It follows

---

[17]     Another sealed matter is In re Search Warrant for Records in the Possession of CAP Quality Care, 2:03-mc-76-WSB, but the solitary *ex parte* motion of September 5, 2003, and the disclosure order of September 6, 2003, that appear on that docket have already been disclosed by the Government.

that when a party requests a seal order, or, as in this case, objects to an unsealing order, a court must carefully balance the competing interests that are at stake in the particular case." Id. at 10.

In opposition to Dr. Shinderman's motion to unseal, the Government has not asserted any important countervailing interest that would warrant continuing to seal the Government's two-to-three year old motions to disclose.  In fact, the Government seems to take the contrarian's view that once the Court has ordered a document sealed, the presumption is that it will remain sealed indefinitely, without the need to articulate any specific reason.  In my review of the docket, which has been limited to only those motions electronically filed, I have observed that all references to CAP patients is by code number, and not by name or any other patient identifying information.  Thus, although I consider patient confidentiality to be a sufficiently important interest to prevent the unsealing of the Government's motions, that interest does not appear to be at stake.  During a telephone conference I arranged in response to Dr. Shinderman's request for a disposition of the motion to unseal ahead of a disposition of his other motions (see Docket Nos. 55 & 56), the Government asserted that unsealing motions in unrelated cases would not serve any interest held by Dr. Shinderman and that the Government ought not be exposed to the bother of having Dr. Shinderman scrutinize the manner of its investigation of unrelated matters.  To this Dr. Shinderman's counsel responded, correctly in my view, that Dr. Shinderman does not need to show an interest in accessing the documents any greater than that of the general public, who are presumed to have a right to access court papers.  Dr. Shinderman's desire to scrutinize the course of the Government's investigation is a legitimate desire, consistent with the rationale for granting public access generally, and coupled with the presumption of access for any member of the public, certainly outweighs the Government's failure to show any need to keep the subject

motions sealed for any longer than they already have been.  Accordingly, I grant Dr. Shinderman's motion to unseal.

As for patient consents, I have already concluded in the context of Dr. Shinderman's motion *in limine* that the Court has an obligation to ensure that patient records and any prospective patient testimony will be used only to the extent authorized and necessary, without unduly compromising patient confidentiality.  Because the regulatory framework calls for Dr. Shinderman, among others, to have an opportunity to seek revocation or amendment of any forthcoming order authorizing the use of confidential records and evidence at trial, I further grant Dr. Shinderman's request to have access to any existing patient consents for those patients anticipated to testify in the Government's case against him, so that there might be a full and fair opportunity for Dr. Shinderman to be appraised of and to be heard regarding whether, and the manner in which, potentially confidential evidence will be introduced at trial.  Said consents shall be disclosed within 10 days of this Order or within 10 days of the Court's resolution of any objection to this Order, unless the Court vacates this Order on appeal.

### Conclusion

For the reasons stated above, I **RECOMMEND** that the Court:

(1)    **DENY** the defendant's Motion to Suppress on Title 42 Grounds (Docket No. 40);

(2)    **DENY** the defendant's Motion to Suppress on Constitutional Grounds (Docket No. 34);

(3)    **DENY** the defendant's Motion for Franks Hearing (Docket No. 37);

(4)    **DENY** the defendant's Motion *in Limine* (Docket No. 36), which requests exclusion of all evidence, but **ORDER** the Government to show cause why it should be permitted to use at trial evidence consisting of patient identifying information or confidential client communications, to the extent it intends to do so; and

(5)    **DENY** the defendant's Motion to Dismiss (Docket No. 38).

In addition to this recommendation, I **GRANT** the defendant's Motion to Unseal and for Disclosure (Docket No. 39).  The Government is **ORDERED** to disclose to the defendant any patient consents it has obtained in connection with the introduction of confidential documentary or testimonial evidence in the trial of this case.  The Clerk is **ORDERED** to unseal the following matters to allow public access:

>  In re Medicaid Records and CAP Quality Care Records, 2:03-mc-34-DMC;

>  In re E-Mail Records of the Brunswick Naval Air Station, 2:03-mc-78-WSB; and

>  In re Search Warrant for Records in the Possession of CAP Quality Care, 2:03-mc-76-WSB.

This Order takes effect 10 days after today's date if no appeal is entered.

## CERTIFICATE

Any objections to this Order on Defendant's Motion to Unseal and for Disclosure shall be filed in accordance with Fed. R. Crim. P. 59.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  March 2, 2006